```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF COLORADO

 3    Case No. 13-cv-00840-PAB-KLM

 4    _____

 5    FIBER, LLC,

 6          Plaintiff,

 7    vs.

 8    CIENA COMMUNICATIONS, INC., et al.,

 9          Defendants.

10    _____

11              Proceedings before KRISTEN L. MIX, United States

12    Magistrate Judge, United States District Court for the

13    District of Colorado, commencing at 1:37 p.m., April 5, 2016,

14    in the United States Courthouse, Denver, Colorado.

15    _____

16              WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS

17    ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED...

18    _____

19                         APPEARANCES

20              GEORGE MATAVA and DONALD LAKE, III, Attorneys at

21    Law, appearing for the plaintiff.

22              JOEL SAYRES and HABIB NASRULLAH, Attorneys at Law,

23    appearing for the defendants.

24    _____

25                         MOTION HEARING
```

```
 1                    P R O C E E D I N G S
 2              (Whereupon, the within electronically recorded
 3    proceedings are herein transcribed, pursuant to order of
 4    counsel.)
 5              THE CLERK:  All rise.  Court is in session.
 6              THE COURT:  Thank you.  Please be seated.  This is
 7    13-cv-00840, Fiber, LLC, versus Ciena Corporation (sic), et
 8    al.  Let's have counsel enter appearances, please.
 9              MR. MATAVA:  George Matava and Donald Lake for
10    Fiber, LLC.
11              THE COURT:  Good morn -- good afternoon.
12              MR. SAYRES:  Good afternoon.  Joel Sayres, Faegre,
13    Baker, Daniels for defendants, Viavi, Lumentum, and Ciena.
14              THE COURT:  Good afternoon.
15              MR. NASRULLAH:  Good afternoon, Your Honor.  Habib
16    Nasrullah for Finisar Corporation.
17              THE COURT:  Good afternoon.  All right.  We're
18    here for a hearing on a motion for protective order.  I have
19    received and reviewed the following documents in connection
20    with this:  A motion for entry of confidentiality and
21    protective order at Docket Number 65, plaintiff's version of
22    the proposed protective order which is at Number 75-1,
23    defendants' redline version of plaintiff's proposed order
24    which is at Number 75-2, defendants' brief in support of its
25    proposed protective order at Number 77, defendants' version
```

```
 1   of the proposed protective order at 77-1 which is essentially
 2   the duplicate, the defendants' redline version of its
 3   proposed order which is, again, a duplicate, 77-2, and
 4   plaintiff's response to defendants' motion for protective
 5   order at 79.  It's plaintiff's motion so I'll hear from
 6   plaintiff's counsel first, Mr. Matava.
 7              MR. MATAVA:  Good afternoon, Your Honor.  The
 8   issue here, I think, is fairly simple.  It's whether the
 9   Court wants to allow their request for three -- a
10   three-tiered protective order, or whether the two-tiered
11   protective order which we submitted which was based upon
12   materials on the Court's website is appropriate.  We feel
13   that the three-tiered protective order is not appropriate for
14   a case like this.  We feel it's terribly burdensome for a
15   small entity like Fiber, LLC.  The proposed protective order
16   from the defendants requires an inspection of software at the
17   producing party's offices in a secure room or some location
18   where everybody can agree upon.  The inspection is going to
19   be done while being supervised by defendant's counsel.  The
20   protective order requires that the expert who's looking at
21   the material then say to counsel, I need to print out a
22   certain number of portions of the software.  And then the
23   producing party, or defendants' counsel, can at that point in
24   time either agree to do that or take it under advisement or
25   argue under, I think, Section 11 of the protective order as
```

Fiber, LLC vs.Ciena Communications, Inc., et al.

```
 1   to whether all of that material is -- is necessary to be
 2   printed out.  And then all of the information must be
 3   maintained in a secured, locked area, whether it be at
 4   plaintiff's counsel or the expert's home or facility.  This,
 5   we think, is burdensome.  It's going to require Fiber to send
 6   their expert at $400 an hour to a location of more than
 7   likely defendant's choosing.  We're going to have to put them
 8   in a hotel for a week or so.  We're dealing here with, I
 9   think, seven accused products that are being sold by Viavi
10   and Lumentum, and four allegedly infringing products that are
11   manufactured and sold by Ciena.  There are, we think,
12   potential disputes for what might occur for the information
13   that needs to be printed out.  There's going to be questions
14   on what a secure location is.  It's probably going to take
15   our expert about a week or so.  He believes that there's
16   probably in the number of tens, twenties, separate programs
17   that are going to have to be reviewed to determine one of the
18   limitations that are in some of the claims that are at issue.
19   It's going to require a lot.  I have been practicing law for
20   38 years and have -- I know.  It's pretty funny, isn't it?
21          THE COURT:  It is funny.  I thought I was the
22   oldest person here.
23          MR. MATAVA:  And -- and I've never had to have a
24   third tier.  I mean, back in the old days a protective order
25   is a protective order.  It's entered.  The lawyers abide by
```

```
 1   it.  The experts abide by it.  And there's no need to go
 2   through all of this additional procedure which is cumbersome,
 3   burdensome, and expensive for my client.
 4         THE COURT:  Well, how is it -- how would this
 5   happen under your version of the protective order?  What
 6   would happen in the event that your expert wants to review
 7   their software?  How would it work?
 8         MR. MATAVA:  Well, presumably written copies of
 9   the software would be provided, or electronic copies would be
10   provided, and they would be designated attorney's eyes only.
11   And the expert would have access to it.  We'd be able to look
12   at it.  We'd be able to print out what he wanted to print
13   out.
14         THE COURT:  And he could do that wherever it was
15   most convenient for him?
16         MR. MATAVA:  Yeah.  And it's going to be much more
17   convenient.  I mean, our expert, it's no secret, we've had to
18   go through IPR proceedings on these patents that were filed
19   by the predecessor companies to Viavi and Lumentum.  His name
20   is David Smith.  He's got a Ph.D. in experimental physics
21   from MIT.  He designed switches that are similar to this back
22   in 2000 to 2002, several years after the work of Fiber's --
23   an assessor company, (indiscernible) Fiber networks.  And he
24   is in his mid 60s.  He's a consultant.  He's not in business.
25   It's not like we're dealing with a situation where we have
```

Fiber, LLC vs.Ciena Communications, Inc., et al.

**Motion Hearing**
**April 05, 2016**

Page 6

```
 1   two competitors, you know, like Finisar and JDSU that --
 2   where there might be some sort of risk of some sort of theft
 3   or some sort of accidental release of software.  This is a
 4   situation where we're dealing with an entity that no longer
 5   is in business.  Fiber has not -- or its predecessor has not
 6   been in business since 2000.  So we're not dealing with
 7   competitors.  Fiber is owned by Ron Katz who's a lawyer out
 8   of New York.  He's in his mid 70s.  His son happens to be the
 9   Dean of DU's law school.  So that -- I mean, there's
10   really -- there's really not this competitive situation that
11   would require this third tier.
12              THE COURT:  Is your expert located in
13   Massachusetts?
14              MR. MATAVA:  He's located in Cleveland of all
15   places, so --
16              THE COURT:  Wow.  A good choice for a guy who's a
17   physicist from MIT, right?
18              MR. MATAVA:  Right.  So, I mean, that's --
19              THE COURT:  I mean, I can say that because I'm
20   from Buffalo.  That's the only reason I could say that.
21              MR. MATAVA:  So that's basically our position.
22   It's not necessary at this point in time.  And, you know, we
23   obviously will protect the software.  We'll do everything
24   that we can.  We're not going to be using any for competitive
25   purposes.  This is just for convenience and to save my client
```

1  some money.

2          THE COURT:  Okay.  Fair enough.  Thank you.  Let

3  me hear from defense counsel.

4          MR. SAYRES:  Thank you, Your Honor.  Fiber

5  characterizes this as a competitor issue, saying it's not a

6  competitor issue, but really what this is, is a data security

7  issue.  And protective orders when source code might become

8  an issue in a case are routine and common.  And just a

9  cursory look, I found four just in this district alone with

10  all the provisions we're asking for.  In fact, the Northern

11  District of California has as their default a protective

12  order in every patent case.  It applies without any action by

13  any of the parties and it contains the same provisions.  And,

14  in fact, candidly most of this is, many of it is verbatim

15  from that model order from the Northern District of --

16          THE COURT:  They do a lot more code cases than we

17  do though in the Northern District.

18          MR. SAYRES:  True.  But to the extent Fiber is

19  contending that code will be an issue here, it's critically

20  important for our clients to protect that, to protect the

21  data security of that.  When you talk about source code,

22  you're talking about a critically sensitive blueprint of a

23  company's product and functionality.  I mean, this is the end

24  result of -- it's not an exaggeration to say decades of

25  research and billions of dollars in investment.  It's the

Page 8

```
 1    type of thing that differentiates products.  When you get
 2    down to specific lines of code, you're talking about things
 3    that even internally are just rigidly safeguarded.  Maybe
 4    three to four people have access to that line of code.  So
 5    what -- what Mr. Matava is proposing is to -- to allow them
 6    to have an electronic copy or a printed out copy, there are
 7    logistic, you know, issues with the printed out copy.  But,
 8    you know, the electronic copy of the source code to use
 9    wherever the expert is convenient for him.
10            THE COURT:  So let me interrupt you for just a
11    moment to ask you some questions about that.  Surely there's
12    some methodology which I'm not aware of, but you may be that
13    allows transmission of a secure electronic copy of source
14    code for just this purpose, for examination and use in
15    litigation that doesn't require the expert to be under lock
16    and key and under guard and all that other stuff, but that
17    allows a secure version of this code to be transmitted
18    electronically to the expert under such circumstances where
19    it cannot be opened by anyone but the expert.  It cannot be
20    viewed or copied or, you know, transmitted.  Isn't there some
21    way to do that?
22            MR. SAYRES:  Honestly, Your Honor, I don't think
23    there is.  And I think that's why every protective order that
24    has a source code provision specifically clarifies it's a
25    stand-alone computer for just that very reason.  Mr. Matava
```

```
 1   and his firm can do everything on their end to protect this
 2   data and put a good faith effort to do so.  But we've seen
 3   just in the last week two major New York law firm's data's
 4   security were hacked.  Something like almost half the end
 5   wall 100 were targets of hacking.  I mean, there's no way to
 6   100 percent secure that if it's just out there.  I mean, for
 7   our clients it's critically important at all times to know
 8   what form this source code is in, who has access to it, and
 9   that there are absolute security measures that it does not go
10   beyond that.  They hand out a copy that you cannot protect no
11   matter how hard you try is a huge data security issue for our
12   clients.  I mean, it would go all the way up to the top
13   levels of our clients.  And it raises issues like, would
14   Mr. Matava's firm be willing to indemnify us for the
15   catastrophic loss that would occur if there was a data
16   breach?
17            THE COURT:  Well, doesn't the client have to
18   transmit it to you so that you have it available at your
19   office?
20            MR. SAYRES:  Right.  And those are things that --
21   protocols that we work hard in place -- to put in place to
22   minimize any risk of that.  I mean, if -- we're their
23   counsel.  We obviously have a more close relationship than
24   handing it off to Mr. Matava's firm or even an expert to go
25   off and review on his own, wherever.
```

Fiber, LLC vs.Ciena Communications, Inc., et al.

```
 1          THE COURT:  Wouldn't -- wouldn't it be most secure
 2   if the expert went to your client's facility so that there's
 3   no copying required?
 4          MR. SAYRES:  And we could -- we could explore that
 5   as well.  I mean, when you talk about burden, we're actually
 6   trying to lessen the burden here.  We're not saying, You go
 7   to Maryland, or, You go to Ottawa, Canada, and you review it
 8   there.  We're willing to set it up in our office.  And it's
 9   not a burdensome issue.  We're in the same building.  He's
10   eight floors above us.  He could come down and we can work
11   out a protocol for reviewing it.
12          I can direct you to an order in this -- in this
13   district.  CV -- 12-cv-02921, Broadnet v. Shoutpoint where
14   the defendants had local counsel in Denver, but their lead
15   counsel was in California.  And the plaintiffs wanted to
16   review the source code in defendant's local counsel's Denver
17   office.  And the -- this Court said, No, you sued a
18   California company, you go to California.  We're not asking
19   them to put -- we're not looking to put any burdens on Fiber
20   or Mr. Matava like that, or his expert.  We're willing to set
21   it up in our office in the same building.  And like all
22   the -- the specific provisions he's talking about, about the
23   protocol, you could look at any protective order with a
24   source code provision, and the Northern District of
25   California, the Eastern District of Texas model order, the
```

Fiber, LLC vs.Ciena Communications, Inc., et al.

**Motion Hearing**
**April 05, 2016**

Page 11

```
 1    District of Delaware default rules on protect -- on source
 2    code, they all have these provisions.  And they're there for
 3    a reason, because it's a data security issue.
 4            THE COURT:  So is it your contention that your
 5    version of the protective order requires execute -- agreement
 6    and execution of a written protocol?
 7            MR. SAYRES:  I mean, I think the provisions of the
 8    protective order contemplate the parameters for how
 9    inspection will take place.  And Mr. Matava and I were
10    talking before this.  I think when it comes to logistical
11    things, I think some of the things that -- that Mr. Matava
12    said were a little bit of an exaggeration when you -- when
13    you actually read the provisions of the -- of the protective
14    order we're proposing, what we say is available during
15    inspection -- available for inspection during normal business
16    hours or other mutually agreeable times.  You know, we're
17    willing to work in good faith to make it convenient as much
18    as possible for everyone.  But at all times we just have to
19    maintain that integrity of that data.  We can't just let it
20    out there.  And, again, this is what all these protective
21    orders are trying to do.  There's -- Number 1, there's
22    (indiscernible) Motorola, 10 ZV 3013, which was one from --
23    Judge Brimmer and yourself entered.  And a lot of these
24    protective orders have even more kind of detailed page
25    limits, objection periods, pretty much unfettered discretion
```

Fiber, LLC vs.Ciena Communications, Inc., et al.

1   for the producing party to say no to someone if they don't

2   like who's going to review it.  So we're not looking to place

3   an onerous burden on -- on Fiber.  These are uncontroversial

4   provisions.  They just simply take into account the -- the

5   critically sensitive nature of source code.  The provision

6   Mr. Matava mentioned about, you know, we -- you know, he's --

7   we're looking at -- we're -- we're -- he's going to be

8   overlooked by counsel.  The specific provision is there is

9   just to make sure that there's no unauthorized, you know,

10  photo-ing of the source code or anything like that.  We're

11  not looking to put any extraneous burdens there.  And that,

12  again, is verbatim out of the model order from the Northern

13  District of California.

14          THE COURT:  Okay.

15          MR. SAYRES:  I'd direct your attention to

16  e.Digital v. Pentax, 09-cv-2578, and EdiSync v. Adobe,

17  12-cv-2231.  Those, again, are example orders that had the

18  same provisions that we're asking for.  So, again, just based

19  on the -- the nature of this issue as a data security issue,

20  it's really not controversial.  It's reciprocal.  We'd be

21  under the same obligations as they would be with respect to

22  source code.  And we're willing -- it will be in the same

23  building, so we don't think it's burdensome at all.

24          THE COURT:  All right.  Thank you.

25          MR. SAYRES:  Thank you, Your Honor.

Page 13

```
 1              THE COURT:  Mr. Nasrullah, would you like to be
 2    heard?
 3              MR. NASRULLAH:  Very briefly, Your Honor.
 4              THE COURT:  Mm-hmm.
 5              MR. NASRULLAH:  And as Your Honor knows, we were
 6    granted permission to intervene in this case yesterday.  I
 7    have tried hard to get up to speed on the protective order
 8    issues and I really haven't.
 9              THE COURT:  Literally yesterday?
10              MR. NASRULLAH:  Yeah.  Yesterday was -- yes.
11              THE COURT:  Okay.
12              MR. NASRULLAH:  And as a result of that, I spoke
13    with Mr. Matava and Mr. Sayres, and -- and I understand the
14    Court has gone ahead and listened to the argument which was
15    well presented by both sides.  It's been helpful for me to
16    hear as well.  What my client would request, Your Honor, is I
17    don't quite know what position we're going to take on the
18    deferring versions of this protective order.  We may take no
19    position, or we may just side with one party or the other, or
20    we may come up with a suggestion that may work for one or
21    both parties.  I am very mindful of the Court's order that
22    you entered yesterday in that granting our motion to
23    intervene premised on the fact that we would not be seeking
24    any delay, and I am cognizant.  What I would ask is three
25    days, up until Friday this week.  In the meantime, I will
```

Page 14

```
 1   confer with Mr. Sayres and Mr. Matava and we will see whether
 2   there's any need for us to submit any further papers or ask
 3   for maybe a short telephonic hearing at which we could
 4   articulate our concerns with the differing protective orders.
 5   And Your Honor has heard argument and hopefully that would
 6   not be too disruptive to the Court, but I'd just ask for
 7   three days.  And, like I said, we are not coming into this
 8   case -- I think Your Honor knows, we're not really trying to
 9   derail anything, but these are important issues, as
10   Mr. Sayres pointed out, given the potential for source code
11   in this case.  So I'd ask for the three days.
12           THE COURT:  All right.  Well, that seems fair to
13   me.  Mr. Matava, let me ask you.  What's your biggest concern
14   about the process that -- the defendant's version of the
15   proposed protective order lays out?  Is it that your expert
16   has to travel from Cleveland to Denver to review the stuff?
17   Is it the fact that he's going to be watched over by the
18   defense counsel?  I mean, what's the greatest concern?
19           MR. MATAVA:  I wasn't going to bring this up, Your
20   Honor, but during the Rule 26(f) conference Mr. Liebman who's
21   the lead counsel for Viavi and Lumentum indicated that his
22   clients -- he and his clients did not want to produce any
23   documentation until the Court ruled on early summary judgment
24   motions, and I view these procedures as being a way to delay
25   the process.  If they feel, defendants feel that we're asking
```

Fiber, LLC vs.Ciena Communications, Inc., et al.

```
 1   for too much information to be printed out, then we're going
 2   to have to go under Rule 11 -- or, excuse me, Section 11 of
 3   the protective order, get declarations from our experts as to
 4   why or why not all of this information should be produced.
 5   We're going to have to file briefs, and then the Court is
 6   going to have to look at it and we're going to have months of
 7   delay as a result of this.  And the -- the way in which this
 8   protective order is drafted, it kind of fits in nicely with
 9   the grand plan that Mr. Liebman talked about during the Rule
10   26 conference.  So that is my principal objection.  I would
11   like to have the software with us.  We'd be willing to work
12   with a stand-alone computer or some sort of sophisticated,
13   and this is beyond my kind as well, but a very secure
14   computer system to work with so that there's no chance at all
15   that this information is going to get out.  And even my
16   expert has said that the software, it may take some time to
17   put together, but nonetheless, it's not, you know, like we're
18   dealing with the formula to Coca-Cola.  Software can be
19   drafted by lots and lots of people.
20             THE COURT:  Not me.
21             MR. MATAVA:  And it's -- not me either.  But
22   nonetheless, you know, this is not the family jewels like
23   Coca-Cola that we're dealing with.  So, you know, I think a
24   stand-alone computer that our expert could work with in
25   Cleveland would probably suffice.
```

```
 1            THE COURT:  Okay.  Well, here's what I'm going to
 2   do.  I don't see any reason why I shouldn't allow
 3   Mr. Nasrullah to have his three days to weigh in.  He may be
 4   able to weigh in in such a way where he says, We agree
 5   entirely with plaintiff, or, We agree entirely with
 6   defendant, or, We have a couple of other suggestions or
 7   whatever, but I'm going to give him a little bit of time to
 8   do that.  I don't think three days is too much time to ask.
 9   So I'm going to take the matter under advisement.  But in
10   that three-day period, Mr. Matava, if you can come up with a
11   concrete proposal for a stand-alone computer in Cleveland
12   that would be -- indeed be secure, because that was exactly
13   my question essentially to Mr. Sayres is, isn't there an
14   alternative that isn't going to require travel and that kind
15   of stuff?  And he said, No.  I'm not personally aware of an
16   alternative.  I'd like to know if there is an alternative
17   that is reasonably secure.  And if you think there is, I'd
18   like you to present it to me by way of explanation of how it
19   would work.
20            MR. MATAVA:  Okay.
21            THE COURT:  And to do that also within three days.
22            MR. MATAVA:  Three days.
23            THE COURT:  Yeah.  Now, I'm not going to at this
24   point say whether I'll allow the other parties to respond to
25   Mr. Matava's proposal or not.  I understand that I'm inviting
```

```
 1  some continuing discussion of this whole subject.  But what I
 2  would like you to do, Mr. Matava, if you're going to put
 3  something in writing for me to consider by Friday about this
 4  possibility of a secure stand-alone computer in Cleveland --
 5        MR. MATAVA:  Mm-hmm.
 6        THE COURT:  -- I want you to at least disclose it
 7  to defense counsel before you file it with me so that you
 8  give him an opportunity to say something about it.
 9        MR. MATAVA:  I'd be happy to.
10        THE COURT:  And so what I'd like you to do is, I'd
11  like to set a deadline.  And, you know, Mr. Nasrullah had
12  asked for three days, but, frankly, Friday at 5:00 it's not
13  likely I'm going to work on this on Saturday.  I do have some
14  things to do on Saturday that are work related, but not this
15  one.  So I probably wouldn't look at it until Monday anyway.
16        MR. MATAVA:  Okay.
17        THE COURT:  So given that, let's do this:  Let's
18  say that Mr. Nasrullah will weigh in in writing by 5:00 p.m.
19  on Monday, April 11th.  That Mr. Matava will weigh in in
20  writing by 5:00 p.m. on Monday, April 11th, but that you will
21  disclose to Mr. Sayres what you're proposing with respect to
22  the secure stand-alone computer in Cleveland no later than
23  noon on Friday, April 8th.  And, Mr. Sayres, I know I'm
24  giving you a limited amount of time to respond, but --
25        MR. SAYRES:  Okay.
```

```
 1              THE COURT:  -- that's the way it's going to be.
 2   I'm going to -- I'd like you to respond also, Mr. Sayres, to
 3   whatever Mr. Matava gives you if you'd like to.  It's not
 4   mandatory, but if you'd like to respond on or before
 5   5:00 p.m. on Monday the 11th as well.  So we'll have this all
 6   wrapped up in terms of everybody's point of view as to what
 7   can be done here by 5:00 p.m. on Monday.  And then I will
 8   issue a ruling in writing as quickly as I can after that.  I
 9   mean, I'm sensitive to the notion that, you know, we want to
10   avoid expensive delay.  That makes sense.  It makes sense
11   from everybody's perspective to do that.  However, I am also
12   sensitive to the idea that, as defendants have said, this is
13   pretty standard stuff when we're dealing with software code.
14   And it is, in fact, a proposed order -- it's very similar to
15   proposed orders that have been entered in software related
16   cases in this Court before.  And, you know, unless there's a
17   better alternative, you know, I'm leaning in the direction of
18   having this process in place.  You know, eight floors is not
19   a big deal for -- for you.  It's a bigger deal for your
20   expert.  But, you know, experts travel.  And that's what they
21   do.
22              So, anyway, if there's an alternative which is
23   reasonable and realistic and it's going to save everybody
24   time and money, I'm all ears.  But if there really isn't in
25   terms of the security issues, and software does present some
```

**Fiber, LLC vs.Ciena Communications, Inc., et al.**

```
 1   unique security issues, then I'm leaning toward the
 2   defendant.  So I just want to make that plain so you
 3   understand what I'm going.
 4           MR. MATAVA:  Okay.  I understand.
 5           THE COURT:  All right?
 6           MR. MATAVA:  All right.
 7           THE COURT:  Fair enough?  Anything else?
 8           MR. MATAVA:  Thank you.
 9           THE COURT:  You're welcome.  Anything else we need
10   to address today from plaintiffs?  Anything else from the
11   defendants?
12           MR. SAYRES:  May -- may I just for a couple
13   minutes, Your Honor?
14           THE COURT:  Yeah.  Go ahead.
15           MR. SAYRES:  Really quickly, not to belabor
16   anything, but I would be remiss if I didn't respond to
17   Mr. Matava's characterization of the Rule 26(f) conference.
18   He referred to it as a grand plan, and he's grossly taking it
19   out of context what happened in that conference.  He's
20   referring to a request for early pre-discovery information
21   which there were discussions about that at that Rule 26(f)
22   conference.  And for various reasons it was not appropriate
23   to engage in early discovery, at least that was defendant's
24   position.  At no time did my colleague suggest that there was
25   an intention to withhold documents until after early summary
```

1   judgment motions.  That's just not a true characterization.

2   And the characterization is the source code is not Coca-Cola

3   I think underplays really the critical nature of source code.

4   So I just wanted to respond to those points without letting

5   them sit out there.

6              THE COURT:  Okay.  Fair enough.

7              MR. SAYRES:  I appreciate it, Your Honor.

8              THE COURT:  I mean, here's -- here's how

9   litigation gets unmanageable, right?  Nefarious motives are

10  attributed by one side to the other, and then back to the

11  other, right?  You guys are all adults.  You've been doing

12  this a long time.  Rest assured that I'm not going to stand

13  for any unnecessary delay or any unnecessary burdensomeness.

14  I'm just not going to.  We've got to get the case through the

15  court, you know.  So I'm your watchdog with respect to those

16  issues.  I take everybody's concerns about moving the case

17  forward in a timely way very seriously.  I'm not going to

18  ascribe nefarious motives to anyone.  You are professionals

19  with a business-related dispute, and you understand your

20  ethical obligations and you're going to adhere to your

21  ethical obligations, and unless somebody points out otherwise

22  to me, I'm not going to presume anybody is doing anything

23  that's underhanded or designed to delay or obstruct or

24  obfuscate the truth of the case.

25              So fair enough.  Let's -- let's approach it in a

Fiber, LLC vs.Ciena Communications, Inc., et al.                    **Motion Hearing**
                                                                      **April 05, 2016**

Page 21

1   good faith way, see if we can come up with something that

2   will work for everybody.  And either way, you're going to

3   have a decision fairly shortly after 5:00 p.m. on April 11th.

4   All right?

5           MR. SAYRES:  Thank you, Your Honor.

6           THE COURT:  Thank you.

7           MR. MATAVA:  Thank you, Your Honor.

8           THE COURT:  Thank you.  We're in recess.

9           THE CLERK:  All rise.  Court is in recess.

10          (Whereupon, the within hearing was then in

11  conclusion at 2:04 p.m.)

12

13

14          I certify that the foregoing is a correct

15  transcript, to the best of my knowledge and belief (pursuant

16  to the quality of the recording) from the record of

17  proceedings in the above-entitled matter.

18

19

20

21  /s/ Laurel S. Tubbs                    April 7, 2016

22  Signature of Transcriber                Date

23

24

25